## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANTHONY GRIFFIN, MARK MCINDOO, and SUSAN DETOMASO, on behalf of themselves and all others similarly situated, | ) ) ) Civil Action No.:   5:16-cv-354 (LEK/ATB) ) |
| Plaintiffs, | ) ) |
| v. | ) **CLASS AND COLLECTIVE** ) **ACTION COMPLAINT** ) |
| ALDI, INC., DOE DEFENDANTS 1-10, | ) **JURY TRIAL DEMANDED** ) |
| Defendants. | ) ) ) |

Anthony Griffin, Mark McIndoo, and Susan DeTomaso ("Plaintiffs"), on behalf of themselves and all others similarly situated, allege as follows:

### INTRODUCTION

1.      This Class and Collective Action, brought by the Store Managers of Aldi, Inc. ("Aldi" or "Defendant"), challenges Aldi's practices and policies of misclassifying Plaintiffs and other similarly-situated Store Managers as "exempt" employees, and not paying them overtime compensation in violation of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL").

2.      Using an employee review system based on metrics that are primarily derived from control of labor budgets, Aldi ensures that its Store Managers spend nearly all of their time performing the same tasks as the hourly workers, such as stocking shelves, unloading trucks, operating cash registers, helping customers and cleaning.

3.      The true managerial authority over the operation of the stores rests primarily with the District Managers, each of whom is assigned to manage three to five stores.  It is the District Managers who perform traditional managerial functions for the stores: they have

{W0277275.1}

authority over hiring and firing, employee reviews and compensation, the flow of merchandise, the physical setup of the stores, safety and maintenance measures, and ultimate authority over the work schedule for every single employee at the store, including Store Managers.

4.      Accordingly, the Store Managers are misclassified as "exempt" employees and should receive hourly pay including overtime.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 201, *et seq*.

6.      This Court also has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative facts.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(ii) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and the Defendant and Plaintiffs are subject to personal jurisdiction in this district.

8.      This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## PARTIES

9.      Plaintiff Anthony Griffin is a resident of New York State who was employed by Aldi as a Store Manager in New York during the statutory period covered by this Complaint. Defendant failed to compensate Mr. Griffin for all hours worked and failed to pay him appropriate overtime.

10.      Plaintiff Mark McIndoo is a resident of New York State who was employed by Aldi as a Store Manager in New York during the statutory period covered by this Complaint.

Defendant failed to compensate Mr. McIndoo for all hours worked and failed to pay him appropriate overtime.

11.     Plaintiff Susan DeTomaso is a resident of New York State who was employed by Aldi as a Store Manager in New York during the statutory period covered by this Complaint. Defendant failed to compensate Ms. DeTomaso for all hours worked and failed to pay her appropriate overtime.

12.     At all relevant times hereto, Plaintiffs were "employees" under both New York State and federal law.

13.     Plaintiffs hereby consent in writing to be plaintiffs in this action and have attached their executed Consent To Sue forms as Exhibit A.

14.     Defendant Aldi was founded in Germany in 1961 and its U.S. operation is headquartered in Batavia, Illinois.  Aldi describes itself as a leader in the grocery retailing industry and operates more than 1,400 US stores in 32 states.  At all relevant times during the statutory period covered by this Complaint, Defendant has transacted business within the State of New York, including within this District.  Upon information and belief Defendant has employed hundreds of Store Managers within New York, and significantly more across the country.

15.     At all relevant times hereto, Aldi was an "employer" of Plaintiffs and other similarly-situated employees, within the meaning of the NYLL and FLSA.

16.     At all relevant times hereto, Aldi was an "enterprise" engaged in commerce or in the production of goods for commerce, within the meaning of the NYLL and FLSA.

## FACTS

17.     Aldi is a global discount supermarket chain that misclassifies Store Managers as exempt employees, even though their jobs are virtually identical to non-exempt employees, in order to circumvent the FLSA and the NYLL and avoid paying the Store Managers overtime.

18.     Aldi markets itself as a discount grocery store.   Aldi's retail strategy is a combination of primarily offering only Aldi-branded products, rather than their more expensive nationally-branded equivalents, and the elimination of conventional supermarket services.   Aldi offers a lean selection of items, only 5% of the inventory found in traditional grocery stores.   The stores are also considerably smaller than traditional grocery stores, averaging only about 18,000 to 20,000 square feet.

19.     One way Aldi is able to maintain its discount prices is by cutting its labor costs. Indeed, during its hours of operation, an average Aldi store has only two or three employees working at one time – one or two cashiers, and either a Store Manager, Shift Manager or Manager in Training ("MIT").

20.     In practice, Store Managers, Shift Managers and MITs are collectively referred to as "managers" and they all wear identical uniforms.   In fact, their jobs are indistinguishable. However, while Shift Managers and MITs are classified as non-exempt and paid overtime compensation, Store Managers are misclassified as exempt and are not paid overtime.

**A.      The Job Of A Store Manager:**

21.     While Store Managers are called "managers" in name, they do not engage in any management and have no meaningful discretion in the operation of the store.   Indeed, the physical nature of their job is identical to that of other hourly employees.   Store Managers spend over 90% of their time on tasks such as unloading supply trucks, stocking shelves, operating cash registers, cleaning the store, setting up product displays (according to specific instruction from the District Managers) and helping customers.

22.     Store Managers are placed on the weekly schedule for 50 hours alongside the hourly employees.   Store Managers are officially scheduled to work either Saturday or Sunday and 4 weekdays (Monday through Friday).   However, Store Managers regularly work more than

50 hours per week as they are forced to work additional hours, usually in excess of 60 hours per week, in order to keep labor costs low, without additional compensation.

23.     Typically, a supply truck arrives at each store overnight several times per week. Some stores have supply trucks arriving at least four times per week, while higher volume stores have trucks arriving every day.  Some stores have their supply trucks arriving during the day, rather than overnight.  Regardless of the time of arrival, a significant portion of any Store Manager's workday consists of unloading the inventory and stocking the shelves.

24.     When a supply truck arrives overnight, the driver typically uses a forklift to unload approximately 24 to 26 pallets of inventory into the stock room.  The driver has keys to only the back stock room, not the main store, as well as the code to disable the alarm for the stock room.  The inventory is left in the stock room until the Store Manager arrives between approximately 5am to 6am to unload the inventory and place it on the shelves.   When the supply truck arrives during the day, the Store Manager or other store employees use the additional forklifts to help the truck driver unload the inventory into the stock room at a quicker pace.

25.     The Store Managers' typical work week begins on Sunday when they arrive at the store between 5am and 6am, which is three or four hours before the store opens, in order to unload the inventory and stock the shelves, coolers, freezers and produce section.  When the labor cost, referred to as the "Budget of Hours," permits, an hourly worker is also scheduled to come in at 6am, 7am or 8am to work side by side with the Store Manager unloading the truck and preparing the store to open; otherwise, the Store Manager works on his or her own.

26.     At stores where the supply truck arrives in the afternoon, rather than overnight, the Store Manager usually works a later shift but does work identical to that of other Store Managers at other Aldi locations.

27.     Once the store opens at 9am, the Cashier goes to operate the cash register while the Store Manager continues unloading the truck, stocking the shelves and cleaning the store.

28.     According to Aldi's policy, if there are more than three customers waiting in line, the Cashier must "buzz" for someone else to open an additional cash register.  Since there are typically only two or three people scheduled to work the morning shift, the Store Manager has to stop their unloading, stocking and cleaning duties and operate the additional cash register, before resuming their unloading, stocking and cleaning tasks.

29.     Store Managers have no discretion regarding the flow of regular inventory to the store.   The computer generated ordering system ("CGOS") automatically orders additional products to replenish inventory.  The CGOS is password protected and electronically controlled by the District Managers, who set up the quantities of each regular inventory product that arrives on the supply truck.

30.     However, "highly perishable items" such as produce and meat are not automatically ordered by CGOS.  Instead the CGOS has a "build-up" figure for these highly perishable items, which states the number of each item that the store should carry.  These build-up figures are also set by the District Managers.  The Store Manager or any other hourly employee, including Cashiers, walk around the store with a Mobile Data Terminal ("MDT") ordering device and enter orders for each highly perishable item to reach the build-up.  For example, if the District Manager set the build-up for chicken to be at 10, any store employee who sees that the store only has four packs of chicken left would simply use the MDT device to order six more.  In this process, the Store Manager has no more discretion than any hourly employee.

31.     Typically, towards the end of their official shift, the Store Manager walks through every aisle of the store, cleaning and restocking the shelves.  Store Managers frequently stay at

least two to three hours after the official end of their shift in order to ensure that all the shelves are fully stocked and the store is cleaned.

32.     On Mondays through Fridays, a Store Managers typically arrives between 5am and 6am, depending on whether there is a supply truck delivery that day.  Usually, supply trucks arrive four out of the five weekdays; some stores have the supply trucks arriving every day.  The Store Manager, once again, unloads the inventory, stocks the shelves, coolers, freezers and produce sections and cleans the store before it opens.  Even on non-supply truck days, a Store Manager is typically scheduled to arrive at 6am in order to restock the shelves from the stock room, rotate products, clean the store and prepare it for open.

33.     On Mondays, the Store Manager takes about 15 minutes to write the employee work schedule for the following week.  The Store Manager must follow very specific rules and guidelines when preparing these schedules.  For example, on non-supply truck delivery days, hourly employees cannot be scheduled to work before 8am.  Additionally, because their jobs are so similar, no Store Manager, Shift Manager or MIT is permitted to work more than two hours at the same time.

34.     Sometimes, these schedules are prepared by hourly Shift Managers and MITs instead of Store Managers.  After the schedule is prepared it is usually faxed to the District Manager who then makes revisions and comments.  When the District Manager is satisfied with the schedule, it will be initialed to show final approval and sent back to the store.  While writing the schedule typically takes only 15 minutes, the entire process of getting the District Manager's approval takes about one hour.  Some District Managers do not require that the draft schedules be faxed to them but instead review, revise and approve the schedules on their first visit to each

store each week.  Usually, the schedule for the following week has to be posted by Tuesday afternoon.

35.     During a typical Monday through Friday work day, the Store Manager continues to unload the inventory, stock the shelves and clean the store for several more hours, depending on how many times they are "buzzed up" to the cash register.  The Store Manager typically then organizes and spruces up the "special buy section" of the store before the District Manager arrives view it.  The special buy section is a display that is set up in the middle of the store every Saturday that features special deals, discounts and promotional items

36.     Every store employee is trained to restock products from the stock room, in order to avoid having product shortages, or "outs," on the floor.  Every store employee is also trained to remove or rotate expired products off the shelves.  Before the District Manager arrives, the Store Manager, or any other store employee walks through the store replenishing and rotating the products, as this is something a District Manager typically checks upon their arrival to the store.

37.     The District Manager visits each store approximately three times per week.  The first visit of the week lasts about five to six hours, while the second and third visit last approximately three to four hours.  On their first visit of the week, the District Manager usually takes the Store Manager, or the Shift Manager or MIT in the Store Managers' absence, on a detailed walk-through, which typically begins outside the store and proceeds through every aisle and every section and area of the store.  The District Manager points out any general cleanliness issues or imperfections in the store set up or product displays, and directs the Store Manager, or the Shift Manager or MIT in the Store Managers' absence, to remedy the situation in accordance with the District Manager's instructions.  Such directions range from taking out the trash to shoveling the snow, removing excess weeds and shrubbery, cleaning the bathrooms, dusting

various crevices of the store, sweeping the aisles, moping the floors, waxing and shining the store floors, cleaning miscellaneous spills, lining up products on shelves so they all faced the right direction, rotating product from the stock room, removing expired products, reorganizing the special section and correcting any other issues detected by the District Manager.

38.     The majority of the rest of the Store Manager's day is spent stocking shelves, cleaning the store, operating cash registers, dealing with miscellaneous things like janitorial work and completing the list of instructions and commands they were given by their District Manager on their walk-through.  On the District Manager's next two visits, they typically add directives to the list and follow up to ensure the previous ones were carried out.

39.     Additionally, as per the corporate mandated customer service policy, every "manager," which according to Aldi includes the Store Manager, and the hourly Shift Managers and MITs, must perform one random customer check each shift.  This includes pulling a customer over at random, checking their receipt and looking through their bags to ensure that nothing was stolen.  The District Managers check security cameras to ensure that such checks were performed every shift.

40.     Before leaving, the Store Manager usually again walks through the store, restocks the shelves and cleans the aisles, before counting out their cash register, referred to as the "till," and leaving for the day.

41.     The District Managers commonly visit each store on at least one day when the Store Managers are not officially scheduled to work.  On such days, the District Managers conduct the same walk-through, and give the same instructions and directions to the hourly Shift Managers or MITs.

42.     On Saturdays, the "special buy section" has to be set up after the store closes, usually at 9pm.  The Store Manager, Shift Manager and MIT typically alternate working the Saturday closing shift as it is most strenuous.  For the Saturday morning shift, a Store Manager is typically scheduled to work at 6am, but may arrive at 5am if a supply truck is expected to arrive, and do the same work as a Sunday morning shift.  For the closing shift, the Store Manager is typically scheduled to arrive at 11am and does the same general work they do on Sundays.

43.     At some point on Saturday, or earlier in the week, the District Manager faxes, emails, drops off or otherwise provides very detailed instructions, pictures and diagrams on how to set up the special buy section; Store Managers have no discretion on the set up.  This section can only be set up on Saturdays after the store closes, typically at 9pm.  Store Managers working the closing shift have to stay several hours after close to set up this section.  When the Budget of Hours permits, an hourly worker is scheduled to assist the Store Manager with the set up; otherwise, the Store Manager works alone until approximately 10pm to 11pm (11 to 12 hours) to set up the special buy section.

44.     Store Managers are salaried employees and do not receive hourly pay or overtime. Store Managers are formally scheduled to work, and payroll records reflect, only 50 hours per week.  However, Store Managers regularly work approximately 60 to 70 hours per week.  These additional work hours are not recorded and Store Managers are not compensated for them.

45.     However, if a Store Manager works fewer than 50 hours in a given week, he or she must make those hours up in a future week.  For example, if a Store Manager has to leave three hours before their shift is over, they must first ask their District Manager for permission to do so and they are required to make up those three hours later in the week or the following week.

46.     Moreover, Store Managers have no "managerial" authority over the hourly employees.  While they typically write the schedules for hourly workers, it is the District Managers who ultimately revise, edit and approve all the shifts, including those of the Store Managers themselves.

47.     Store Managers do not have the authority to hire, fire, grant promotions or raises, or impose disciplinary measures.  These decisions are made by the District Managers.

48.     The Store Manager does not even have access to the personnel files of the workers he or she is supposedly supervising.   That privilege also rests with the District Managers.

49.     Store Managers have no control over the flow of inventory into the store.  The CGOS program automatically replenishes regular products that are low in stock.  The supply truck delivers inventory to each Aldi store based on the automated CGOS list, which is password protected and controlled by the District Managers.  The "highly perishable items" are ordered manually using the MDT device, by any store employees, including the Cashiers.  However, these highly perishable products must be ordered up to the "build-up" figure, which is also set up by the District Managers.  A Store Manager, or anyone else ordering the highly perishable items, must comply with the build-up or ask the District Manager's permission to deviate.

50.     While Store Managers usually prepare the employee work schedule for the week, they have very little discretion with the allocation of the limited number of hours among the hourly employees.   The District Managers dictate precise rules that schedule makers must follow, such as requiring that the shifts of the Store Managers and the Shift Managers or MITs do not overlap by more than two hours.  The District Managers also set requirements on the start time for hourly employees.  For example, on non-supply truck days, hourly workers cannot come

in before 8am and on weekends there must be an additional closing shift.   Moreover, all schedules must be submitted to the District Managers for revisions, comments and ultimate approval.   As such, the amount of scheduling discretion is so limited that the schedule is sometimes prepared by hourly workers such as Shift Managers or MITs.

51.     When District Managers are not at the store they often call in to inquire about the sales figures, which are tracked by Aldi's computer system at each store.   The Store Manager, Shift Manager or MIT is then required to read off the sales figures to the District Manager.   If the figure is below target, the District Manager often directs the Store Manager, Shift Manager or MIT to send an hourly worker home in order to save on labor costs.

52.     Store Managers may not schedule overtime.   Any requests for overtime must be approved in advance by the District Managers.

53.     Store Managers cannot approve personal leave or medical leave.   That is done by the District Manager.   Indeed, all human-resources related issues go directly to the District Managers.

54.     All Aldi store employees, including all managers and Cashiers, are required to wear Aldi uniforms.   The uniforms of the Store Managers, Shift Managers and MITs are identical, while the Cashiers have a slightly different uniform.   District Managers, on the other hand are advised to wear business attire.   Store Managers may not approve replacement uniforms for the hourly employees.   Such requests are made by filling out a special form and submitting it directly to the District Manager.

55.     Store Managers do not approve the timecards of the hourly employees for weekly payroll purposes.   The time cards must be submitted to the District Managers for verification.

56.     All email, mail, alarm notifications and security camera footage go directly to the District Managers.

57.     Store Managers have no authority to alter the design of the store or the location of inventory on the shelves.  The configuration of each store, its inventory and the special buys section is communicated to the Store Managers, or the Shift Managers or MITs in the Store Managers' absence, by the District Managers.

58.     A Store Manager's job description, as provided by Aldi, specifically includes "Follow[ing] the instructions of the District Manager for special displays of designated items" and "Maintain[ing] a clean store, making sure that the conditions meet the approval of the District Manager."

59.     Store Managers have no discretion relating to the safety and security of the stores. Any security issues, such as customer shoplifting, employee related theft or government inspections, must be reported promptly to the District Managers.  Indeed, Store Managers have no authority to discipline other employees or make decisions relating to store security; such discretion is reserved for the District Managers.

60.     Store Managers are no longer permitted to mark down the prices of nearly expiring products; such mark downs are set only by the District Managers.  Only after the District Manager decides to mark down an item and makes that notation in the records can the Store Manager, or any other store employee, physically change the price of that item on the store floor.

61.     Store Managers are not even permitted to order supplies for the store, such as pens, paper, brooms, cleaning supplies, paper towels, soup and toilet paper, in excess of $100 without prior authorization from a District Manager.

62.     In sum, Store Managers have no greater authority than hourly exempt Shift Manager or MITs and have only slightly more authority than Cashiers.  The real discretion relating to the management of the stores is exercised exclusively at levels above the Store Managers.

63.     Store Managers are paid salary based on 50 hours per week, regardless of the actual number of hours worked, and do not receive overtime compensation.  Additionally, Store Managers do not receive "Spread of Hours" pay pursuant to New York State law when they work more than ten hours in a single day.

**B.     <u>Achieving Productivity Figures Is Central To A Store Manager's Job:</u>**

64.     A Store Manager's job security depends on meeting their "Productivity Figure." This figure is a monthly and a yearly metric that is tracked daily.

65.     Store Managers are eligible for annual bonuses when they meet their Productivity Figures.  Conversely, Store Managers can be terminated if they fail to meet their Productivity Figures.

66.     The Productivity Figure is equal to store sales divided by the Budget of Hours. The Productivity Figures are set by Aldi, at levels above Store Manager, with no input from the Store Managers.

67.     On the other side of the equation, Store Managers also have very little ability to control store sales.   Indeed, Aldi markets itself as a discount grocery store and competes primarily on price.    Prices are set by Aldi, not Store Managers.  Store Managers have no authority to run promotions or special sales.  Instructions to do so come through the District Managers.

68.     The only variable in this equation that a Store Manager can directly affect is the Budget of Hours.

69.     Store Managers are, therefore, constantly forced to lower the number of hours allocated to hourly non-exempt workers and instead "cover" those hours themselves, unpaid, in order to make their Productivity Figures.

70.     Often, if a store's sales are not on target, the District Manager would adjust the Budget of Hours by sending hourly workers home or revising the work schedule in order to maintain the Productivity Figure.   When such hourly shifts are cut, the unfinished work falls squarely on the Store Manager as the only "exempt" store employee.

71.     As such, Store Managers are often forced to work considerably more than 50 hours per week performing work that is otherwise done by the hourly employees, because the additional time they work is not counted (as they are not paid for it) and does not factor into the Productivity Figure equation.

72.     The Store Managers are essentially a flexible component at the center of Aldi's budget.  They can be pushed to work more hours without costing Aldi anything in order to meet Productivity Figures.

73.     Store Managers are given annual bonuses if they exceed their Productivity Figures requirements and are typically terminated if they fall short.

**C.     The Store Manager Job Differs Little From The Hourly Workers And Does Not Have More Responsibility**

74.     Aldi classifies its Cashiers, Shift Managers and MITs as non-exempt employees, and pays them on an hourly basis with overtime.

75.     However, the actual job of a Store Manager is virtually indistinguishable from that of an hourly worker such as a Shift Manager or an MIT.   In practice, Store Managers, Shift Managers and MITs are commonly referred to, by Aldi, collectively as "managers."

76.     There is nothing that a Store Manager does that another manager does not regularly handle on a routine basis.  As such, Aldi has strict rules which forbid a scheduling overlap of more than two hours for any manager.

77.     A typical Aldi store officially functions for more than 50% of its hours of operation without the presence of a Store Manager.  The remaining hourly employees routinely perform all the same tasks that a Store Manager would otherwise do for a majority of the time Aldi is actually open for business.

78.     Shift Managers and MITs are even required to have copies of the store keys as well as access to an extra office key.

79.     Indeed, there is nothing that a Store Manager is tasked to do that an hourly, non-exempt Shift Manager or MIT does not routinely handle.  For example, like Store Managers, every Shift Manager and MIT is required to perform a random customer check every shift, the Shift Managers sometimes prepare the weekly schedules, every store employee is trained on using the forklift, every store employee uses the MDT device to order highly perishable items, any store employee can add additional store supplies to the order as long as it does not exceed $100, Shift Managers and MITs may "count out" the Cashiers' tills before they leave, if a money car does not come for pickup, any store employee can deliver the store's money bag to the bank, all store employees are required to remove expired items from the shelves, all store employees are trained to rotate products from the stock room to avoid "outs" on the floor, all store employees operate the cash registers, all store employees are responsible for unloading the supply truck, stacking the shelves and cleaning the store.

80.     Moreover, the only difference between the work performed by Store Managers, Shift Managers and MITs compared to that of Cashiers, is that Cashiers need "managers" to

count out their tills, Cashiers do not have keys to enter the store, Cashiers are not required to perform customer checks every shift and Cashiers cannot approve restricted transactions at the register, such as exchanges or returns, which any "manager" may approve.

81. Aldi's corporate website contains videos that exhibit the identical nature of the work performed by Store Managers, Shift Managers, MITs and Cashiers, which Aldi justifies as "teamwork."[1] One video shows "Ben," a Store Manager, operating a forklift, pulling a pallet of inventory boxes, stocking shelves, waxing and shining the store floors and working with a Cashier to organize and align products on the shelves, while talking about all the demanding tasks and jobs that need to be completed every day.

82. The Shift Manager video shows "Kim" pulling a pallet of inventory boxes, working with an MIT to stock the shelves and interacting with customers, while stating that because there are only two or three people on the floor, everyone has to pitch in and help do the work and that they all have to "multitask to get everything done." The video also shows Kim working side by side with Ben the Store Manager while operating the cash registers.

83. The MIT video shows "Amanda" organizing and rotating products, interacting with customers, working with Kim the Shift Manager to stock the shelves, moving carts of inventory in and out of the stock room and sweeping the floor, while stating that everyone has to "give 120% and be a team player."

84. The Cashier video shows "Miriam" doing the same tasks as those performed by the "managers." In the video, Miriam is interacting with customers, operating the cash register, stocking and organizing the products on the shelves, while stating that if you are a hardworking person, then "Aldi is the place for you."

---

[1] http://aldistorejobs.com/our-people?v=/video/.

85.     The Store Manager, Shift Manager and MIT are all displayed wearing identical uniforms doing exactly the same work: stocking shelves, organizing and rotating products, cleaning the store, interacting with customers and operating the cash register.

**D.     District Managers Are The Real Managers:**

86.     It is the District Managers who control and truly manage the business of their assigned 3 to 5 stores.

87.     As expressed by District Manager "Lou" in Aldi's job recruitment video – his peer advisor was "excellent" in teaching him "everything [he] needed to learn about running a store."[2]  Likewise, in another video, "Ryan" states that a District Manager has to "take the role of a leader," "manage people" and "operate [each store] as their own business."

88.     District Managers direct the conduct of the Store Managers and communicate to them the specific guidelines, objectives, policies and practices that need to be performed at each store.  Moreover, the District Managers visit each store location two to three times per week and specifically instruct Store Managers on the precise method in which such objectives are to be implemented.

89.     District Managers typically visit each store they supervise three times per week. The first visit usually lasts five to six hours, while subsequent visits last approximately three to four hours.  On their first visit of the week, District Managers typically arrive at the store around opening time and perform various managerial tasks.  Such tasks typically include checking the balance of the cash registers against the logs, confirming bank deposits, setting price mark downs of nearly expiring products, printing and filing the authorization forms for the price changes, reading mail, checking email, reviewing security camera footage and conducting other managerial and supervisory duties.

---

[2] http://aldiuscareers.com/district-managers/our-people.

90.    The District Manager also does a detailed walk-through with a Store Manager, or with a Shift Manager or MIT if a Store Manager was not scheduled to work that day.  This walk-through typically begins outside and continues through every aisle, section and area of the store and consists of detailed instructions and commands from the District Manager ranging from taking out the trash to shoveling the snow, removing excess weeds and shrubbery, cleaning the bathrooms, dusting various crevices of the store, sweeping the aisles, moping the floors, waxing and shining the store floors, cleaning miscellaneous spills, lining up products on shelves so they all faced the right direction, rotating product from the stock room, removing expired products, reorganizing the special section and correcting any other imperfections detected by the District Manager.

91.    Upon completion of this walk-through, the District Manager typically continues performing various managerial tasks, which may include reviewing resumes of prospective employees, scheduling interviews and tracking the sales figures, productivity figures and allocated employee work hours for the following week.  Sometimes, the District Manager adjusts the weekly schedule or sends certain hourly employees home if the store is not meeting their targeted sales, in order to maintain productivity.  The District Manager also reviews orders to ensure that the store has adequate inventory, checks pricing and adjusts the CGOS guidelines.

92.    Towards the end of a District Managers' day at the store, they follow up with the Store Manager, or the Shift Manager or MIT in the Store Managers' absence, to ensure that all the issues they previously noted on their walk-through were remedied.

93.    The District Manager usually makes two additional visits to the store which last approximately three to four hours. Often times, the Store Manager is not present for at least one of these visits.

94.     On their visits to the store, District Managers typically address personnel issues, such as the need to discipline an employee, or respond to requests for personal or medical leave. District Managers also have to authorize store expenses in excess of $100 and review security camera footage to ensure that the Store Manager and all Shift Managers and MITs had performed a random customer check at least one time per shift.

95.     On their subsequent visits to the store, the District Manager follows up to ensure that all their previous instructions and directions were carried out.  The District Manager takes the Store Manager, or the Shift Manager or MIT in the Store Managers' absence, on additional walks through the store and gives additional instructions on things that need further attention, such as more cleaning, display changes or additional product rotation.  On such walks, the District Manager also notes any product shortages and raises its quantity in the CGOS.

96.     The District Manager also performs additional administrative and managerial tasks and continues to track the sales performance of the store and adjusts the work schedule accordingly.  The District Manager also typically continues to examine the CGOS and adjust the build-up figures to ensure that proper inventory amounts are being ordered.

97.     About once per week, the District Managers perform a random cash register audit to ensure that the balance in the register matched the receipts.  If the balance is off by even a few dollars, the District Manager writes-up the Cashier and puts it in their file; if the Cashier was more than $100 off, they will be immediately terminated by the District Manager.

98.     If the Store Manager is not on target to meet their Productivity Figure requirements, the District Manager directs the Store Manager to cut the shifts of hourly employees (which are factored into the Productivity Figure) and instead have the Store Manager

work additional hours (which they are not paid for and in turn are not factored into the Productivity Figure).

99.    If the Store Manager fails to meet their Productivity Figure requirement, the District Manager typically prepares a disciplinary write-up documenting the "situation" and places it into the Store Manager's file.  After several such write-ups the Store Manager would be terminated.

100.    District Managers have discretion to classify and reclassify hourly employees as "eligible" or "casual" employees for benefits purposes, without any regard or input from Store Managers.  Moreover, hourly employees must notify the District Managers, not the Store Managers, of any changes in their personal information.  The 2015 Aldi Employee Handbook ("Handbook") states that access to employee records is restricted to District Managers as they "have legitimate business reasons for accessing your personnel data."  The Handbook also states that District Managers, rather than Store Managers, are to be "notified immediately" of any accident reports submitted to the divisional office.  Likewise, any security or theft-related suspicions are to be reported to the District Managers.

101.    The District Managers have sole authority to waive the requirement that hourly employees work their full scheduled shift the day before and after a holiday in order to be eligible for holiday benefits.  Even Store Managers must seek the approval of District Managers before taking a day off before or after a holiday.  All schedules must to be approved by District Managers before becoming final.  Moreover, District Managers often adjust and revise the schedules based on whether the store is on target with its Productivity Figures.

102.    Moreover, the District Managers, not the Store Managers, have discretion to grant personal leave to hourly employees.

103.    Overtime scheduling can only be authorized by the District Managers, not the Store Managers.

104.    All military leave questions are directed to the District Managers, not Store Managers.

105.    All hiring, termination and promotions decisions regarding hourly workers are made by the District Managers, not the Store Managers.

106.    All employee resignations have to be reported to the District Managers.

107.    All hourly employee time cards have to be submitted to the District Managers, not the Store Managers, for verification.

108.    All uniform replacement requests from hourly employees are to be made directly to the District Managers, not the Store Managers.

109.    The flow of inventory to each store is directly controlled by the District Managers, not the Store Managers.  It is the District Managers who have access the CGOS program and are able to set and adjust the guidelines and "build-up" figures, not the Store Managers.

110.    The District Managers, rather than the Store Managers, determine the physical configuration of the store and the special buy section.

111.    All store employees, including Cashiers, may order supplies for the store, such as pens, paper, brooms, cleaning supplies, paper towels, soup and toilet paper; however, any purchase over $100 must first be authorized by a District Manager, not the Store Manager.

112.    All price changes and markdowns must be authorized by the District Managers, not the Store Managers.

113.    Moreover, the District Managers, rather than the Store Managers, must be immediately notified of any repairs needed on equipment or the store building.  Likewise, any inventory loss due to inferior or damaged products must be reported to the District Managers.

114.    The Aldi website also contains videos displaying the jobs of District Managers.[3] The District Manager videos are strikingly different from those of the managers and the Cashier. First the Aldi website shows District Managers wearing business suits rather than the manager's uniform.  One District Manager video shows "Lou" standing in an Aldi store, yet unlike the Store Manager, Shift Manager and MIT, he was doing absolutely no manual labor.  Instead the video shows another "manager" (based on the uniform) pulling an inventory cart out of the stock room.  In the video, Lou talks about how his peer advisor taught him "how to run a store," how he personally recruited and trained a Store Manager and how being a District Manager is "not a job but a career."

115.    A second District Manager video shows "Synticee" also dressed in a business suit again standing in an Aldi store and performing absolutely no manual labor.  The video shows Synticee speaking with Ben the Store Manager while she holds a clipboard and points at various products on a shelf.  The video also shows Synticee speaking about how store employees work like a team and do what it takes "to get the job done" while the video shows two different "managers" (based on their uniforms) stocking shelves and interacting with customers.

116.    Another video shows "Sarah" a Director of Administration, explaining how she was previously a District Manager and "love[s] the responsibility involved with the District Managers' position." Sarah goes on to explain that she likes "the fact that you are the one that is hiring and terminating employees" and that "you are the one that has the opportunity to promote

---

[3] http://aldiuscareers.com/district-managers/our-people.

the people that work out well for you." She again states that the best part of being a District Manager is the responsibility that comes with the position.

117.  Another video shows "Ryan" talking about "what it's like to be a District Manager" stating that a District Manager has to "look at each store as their own business and be able to operate it as their own business."  He emphasizes that a District Manager has to be able to "take the role of a leader."  Ryan concludes by stating that if you are "someone who really wants to lead people and manage people and have an impact in peoples' lives, in various forms and various ways, this is the career for you."

118.  Another video shows 'Tricia' a Director of Operations, stating that once a District Manager is assigned to a district they are responsible for "everything that goes on in those stores."

119.  From the perspective of the District Managers, all the workers in the stores, including the Store Managers, have essentially the same job function.  They spend most of their time unloading trucks, stocking the shelves, helping customers and cleaning.  The few tasks that might be considered managerial can be performed by hourly workers as well.

120.  Unlike a Store Manager, a District Manager is required to have a Bachelor's degree and a minimum grade point average (GPA).  Moreover, a Store Manager can never be promoted to a District Manager.  The highest position a Store Manager can achieve is Warehouse Supervisor – which also does not require a Bachelor's degree.  District Managers, on the other hand, are not limited in their upward mobility and promotion eligibility.

121.  In sum, it is the District Managers who are the true "managers" under the FLSA and the NYLL, not the Store Managers.

**THE PLAINTIFFS**

A.    **Anthony Griffin:**

122.    Mr. Griffin was employed by Aldi from August 2004 to July 2014.  He started as an MIT and nine months later was promoted to Store Manager at the Camillus, New York location.  Three years later he moved to the Erie Blvd., Syracuse location ("Erie Store") and continued working there as a Store Manager until July 2014.

123.    As a Store Manager, Mr. Griffin was moved to salary compensation, rather than hourly and reclassified as an exempt employee.  However, there was no difference in the work that he had done as an MIT compared to a Store Manager.  Moreover, as a Store Manager, Mr. Griffin's work was no different than that of a Shift Managers' who routinely performed identical tasks.

124.    As a Store Manager, Mr. Griffin was required to work at least 50 hours per week but routinely worked approximately 65 hours every week.

125.    Mr. Griffin was not permitted to leave the store until the Shift Manager or MIT arrived; if they were late or called out, Mr. Griffin had to cover their shifts for no additional pay.

126.    Mr. Griffin often worked his days off and the shifts of hourly workers in order to "hit" his required Productivity Figure and avoid termination.

127.    Mr. Griffin spent less than one hour each week preparing the weekly schedule, including the time he spent revising it in accordance with the edits he received from his District Manager and faxing it back and forth to obtain final approval.  Moreover, it was often the two Shift Managers at the Erie Store that prepared the weekly schedule, rather than Mr. Griffin himself.

128.    Mr. Griffin spent more than 95% of his time performing tasks such as unloading inventory, stocking shelves, operating the cash register, cleaning the store, setting up product displays (according to specific instruction from the District Managers) and customer service.

Mr. Griffin worked with hourly store employees who performed these same exact tasks side by side with him, except those employees were paid hourly wages and compensated for overtime while Mr. Griffin was not.

129. The supply truck arrived at the Erie Store every Sunday and four out of five days Monday through Friday. On such supply truck days, Mr. Griffin arrived at the store at 5am or 6am and to unload roughly 26 pallets of inventory from the stock room. Mr. Griffin used a cart to pull the pallets through the store and stock the shelves. Mr. Griffin then swept and mopped the floors and performed other cleaning tasks before the store opened for business at 9am. When the Budget of Hours allowed, a Cashier was be scheduled to come in at 6am, 7am or 8am to help Mr. Griffin with this manual labor. If the Productivity Figure was not on target, Mr. Griffin was required to perform this work alone until 9am when a Cashier was be scheduled to begin their shift.

130. On non-supply truck days, the Cashier was not permitted to be scheduled to arrive before 8am and Mr. Griffin worked alone to restock the shelves from the stock room, clean the store and prepare it for open.

131. On supply truck days, Mr. Griffin typically spent three to four hours unloading the inventory, stocking the shelves and preparing the store for open. On non-supply truck days, Mr. Griffin spent about 3 hours restocking the shelves from the stock room, to prevent having "outs" on the floor, and preparing the store for open.

132. Each day, Mr. Griffin spent approximately two to three hours operating the cash register and an additional three to four hours interacting with customers, rotating products from the stock room, removing expired products, organizing and aligning products on the shelves to make them look more uniform, ordering highly perishable items, restocking the shelves to

prevent having "outs" on the floor and cleaning the store.  Mr. Griffin also spent approximately one to two hours on miscellaneous tasks which ranged from attending to an overflowing toilet to performing random customer checks and monitoring for suspected shoplifting (which had to be promptly reported to the District Manager).  Typically, these duties, which were identical to those of hourly employees, amounted to 12 hours per day.

133.    Mr. Griffin had no managerial authority over the operations of the store or the hourly employees.  Mr. Griffin had no right or authority to hire, fire, promote or discipline any of the hourly employees.  All such decisions, including any compensation issues, were handled exclusively by the District Manager.

134.    Mr. Griffin had no authority to mark down prices or change the physical layout of the store.  The specifications of the special buy section were drawn out by the District Manager and had to be followed without deviation.

135.    On days when Mr. Griffin was not scheduled to work, the Shift Managers, MITs and/or Cashiers did the same work that Mr. Griffin had done.  Even when Mr. Griffin was working, the nature of his job was mostly indistinguishable from that of the hourly, non-exempt employees, except that he was required to work more than 40 hours per week and was not given overtime compensation.

**B.    <u>Mark McIndoo:</u>**

136.    Mr. McIndoo was employed by Aldi from November 2006 to August 2015.  He started as an MIT at the Camillus, New York store, being paid $19.50 per hour.  Mr. McIndoo continued as an MIT for nine months and joined the Erie Store in January 2007.  In August 2007, McIndoo was promoted to Store Manager of the Clay, New York store ("Clay Store").

137.    As a Store Manager, Mr. McIndoo was moved to salary compensation, rather than hourly and reclassified as an exempt employee.

138.    As a Store Manager, McIndoo was required to work at least 50 hours per week but routinely worked approximately 65 hours every week.

139.    Mr. McIndoo spent less than one hour each week preparing the weekly schedule, including the time he spent obtaining the District Manager's final approval.

140.    Over 95% of Mr. McIndoo's weekly work involved manual labor and other routine tasks regularly performed by hourly non-exempt employees.

141.    The supply truck came to Clay Store every Sunday and four out of five days Monday through Friday.  On such supply truck days, Mr. McIndoo arrived at the store at 5am or 6am and to unload the inventory from the stock room, stock the shelves, clean the store and prepare it for opening at 9am.  When the Budget of Hours allowed, a Cashier was scheduled to come in at 6am, 7am or 8am to help Mr. McIndoo with this manual labor.  If the Productivity Figure was not on target, Mr. McIndoo did this work alone until 9am when a Cashier was scheduled to begin their morning shift.  On non-supply truck days, the Cashier was not permitted to be scheduled before 8am and Mr. McIndoo worked alone to restock the shelves, clean the store and prepare it for open.

142.    Each day, Mr. McIndoo typically spent five to six hours stocking shelves, two to three hours operating the cash register, one to two hours cleaning the store and two to three hours speaking to customers, filling up produce and rotating supplies out of the back stock room. These manual labor duties, which were identical to those of hourly employees, amounted to about 12 hours per day.

143.    Mr. McIndoo was "officially" scheduled to work less than 50% of the time the Clay Store was open for operation.  In Mr. McIndoo's absence, the Shift Managers, MITs and Cashiers (who were all hourly workers) performed the same work that Mr. McIndoo had done.

144.    However, because Mr. McIndoo's job depended on his Productivity Figure, he often worked longer hours and his days off in order to "cover" for hourly employees because, unlike the hourly non-exempt workers, the hours he worked did not count against his Productivity Figure since Aldi did not have to pay him for those hours.

145.    Mr. McIndoo had no managerial authority over the operations of the store or the hourly employees.  Mr. McIndoo had no right or authority to hire, fire, promote or discipline any of the hourly employees.  All such decisions, including any compensation issues, were handled exclusively by the District Manager.

146.    Mr. McIndoo had no authority to mark down prices or change the physical layout of the store.  The specifications of the special buy section were drawn out by the District Manager and had to be followed without deviation.

147.    Notably, at the Clay Store, it was the Cashiers, rather than Mr. McIndoo, who routinely, and without supervision, ordered the highly perishable items using the MDT device. Moreover, at the Clay Store, Cashiers were sometimes asked to take the "bank bag" with the money from the cash registers to the bank; however, Mr. McIndoo often chose to do this task because the bank was on his way home from the store.  However, in his absence, Cashiers, Shift Managers and MITs routinely handled this task.

148.    Mr. McIndoo's District Manager came to the Clay Store three times per week. The first visit was about five to six hours while the next two were three to four hours.  Mr. McIndoo was typically present for two out of these three visits.  When he was present, the District Manager discussed with him his Productivity and Sales Figures and adjusted the schedule to stay on track with targeted productivity.  When Mr. McIndoo was not present, the District Manager conducted these discussions with the Shift Managers and/or MITs.

149.    During these visits, the District Manager also communicated to Mr. McIndoo and/or the Shift Managers and/or MITs specific instructions on product displays and how to implement corporate-mandated customer service policies.  For example, Mr. McIndoo and the entire Clay Store were directed to say "hello" to anyone within 10 feet of them.  The District Manager also instructed Mr. McIndoo and the Clay Store Cashiers to apply a policy whereby they had to stop a checkout process to assist a customer asking them for change to use the automated shopping cart machine.  At one point, for example, the District Manager came to the Clay Store to implement a corporate-mandated policy, whereby, if the number of customers in a checkout line reached a certain point, a Cashier was required to call for assistance.  Mr. McIndoo had no discretion or control over these policies.

150.    On days when Mr. McIndoo was not scheduled to work, the Shift Managers, MITs and/or Cashiers did the same work that Mr. McIndoo had done.  Even when Mr. McIndoo was working, the nature of his job was mostly indistinguishable from that of the hourly, non-exempt employees, except that he was required to work more than 40 hours per week and was not given overtime compensation.

**C.    Susan DeTomaso:**

151.    Ms. DeTomaso was employed by Aldi from 1998 to October 2013.  She started as a part-time cashier then became a full-time cashier before being promoted to Shift Manager.  Shortly thereafter, she became a Store Manager at the Auburn, New York location ("Auburn Store").

152.    As a Store Manager, Ms. DeTomaso was moved to salary compensation, rather than hourly and reclassified as an exempt employee.  However, there was absolutely no difference in the work that she had done as a Shift Manager compared to a Store Manager.

Moreover, as a Store Manager, Ms. DeTomaso's work was no different than that of other Shift Managers at the Auburn store, who routinely did the same exact tasks as she herself did.

153.     As a Store Manager, Ms. DeTomaso was required to work at least 50 hours per week but routinely worked at least 60 to 70 hours every week.

154.     Ms. DeTomaso often worked her days off in order to "hit" her required Productivity Figure and not be at risk for termination.

155.     Ms. DeTomaso spent less than one hour each week preparing the weekly schedule, including the time she spent revising it in accordance with the edits she received from her District Manager and faxing it back and forth to obtain final approval.

156.     More than 95% of Ms. DeTomaso's time was spent doing the same tasks as those performed by non-exempt hourly employees, which included: unloading the inventory from the stock room, stocking shelves, operating the cash register, cleaning the store, setting up product displays (according to specific instruction from the District Managers) and customer service.

157.     On supply truck days, Ms. DeTomaso arrived at the Auburn Store approximately three to four hours before it opened at 9am, in order to unload the inventory, stock the shelves and clean the store.  Typically, a Cashier was scheduled to arrive at 6am to assist with these tasks; however, if the Productivity Figure did not allow for the scheduling of additional hourly workers, Ms. DeTomaso performed this manual labor alone.

158.     The Auburn Store typically had Ms. DeTomaso (or a Shift Manager or MITs in her absence) and one Cashier scheduled to work at 6am.  A second Cashier typically arrived at 9am or sometimes 11am, depending on the Budget of Hours.  According to Aldi's corporate policy, if more than three people were in line, the Cashier was required to "buzz up" another

person to open another register.  Since, only two or three people worked the morning shift, Ms. DeTomaso was often buzzed up to work the cash register.

159.    Ms. DeTomaso then continued stocking shelves, rotating product, removing expired products, ordering highly perishable products, interacting with customers, cleaning the store and attending to miscellaneous issues such as spills.

160.    When the District Manager arrived at the Auburn Store, Ms. DeTomaso spent considerable time walking through the entire store premises, starting outside, and making note of all the instructions, commands and directives given by the District Manager.  Such orders ranged from taking out the trash to shoveling the snow, removing excess weeds and shrubbery, cleaning the bathrooms, dusting various crevices of the store, sweeping the aisles, moping the floors, waxing and shining the store floors, cleaning miscellaneous spills, lining up products on shelves so they all faced the right direction, rotating product from the stock room, removing expired products, reorganizing the special section and correcting any other imperfections detected by the District Manager.

161.    The District Manager subsequently followed up with Ms. DeTomaso, or a Shift Manager or MIT in her absence, to ensure all of his issues and instructions were addressed and carried out.

162.    Ms. DeTomaso was formally scheduled to work less than 50% of the time the Auburn Store was open for business.  However, Ms. DeTomaso frequently had to cover the shifts of hourly workers when the Productivity Figure required the cutting of certain hourly shifts.  Ms. DeTomaso was forced to work these additional shifts without any additional compensation, doing the same tasks as the hourly workers for whom she was covering.

163.    Ms. DeTomaso had no managerial authority over the operations of the store or the hourly employees.  Ms. DeTomaso had no right or authority to hire, fire, promote or discipline any of the hourly employees.  All such decisions, including any compensation issues, were handled exclusively by the District Managers.

164.    Ms. DeTomaso had no authority to change the physical layout of the store.  The specifications of the special buy section were drawn out by the District Manager and had to be followed without deviation.  Each week, the District Manager went over the specifics of the special buy sections with either Ms. DeTomaso, or a Shift Manager or MIT in her absence. These special buy sections had to be set up every Saturday after the store closed.

165.    Ms. DeTomaso alternated working the Saturday closing shift with the Shift Managers and MITs, because it was the most strenuous.  On such days, Ms. DeTomaso was officially scheduled to work 11am to until the store closed at 9pm (10 hours).  However, because the special buy section could only be set up after store closing, she frequently stayed until 10pm or 11pm to complete the set up.  Sometimes an hourly worker was scheduled to assist Ms. DeTomaso with this manual labor; other times, depending on the Budget of Hours, she worked alone.

166.    On days when Ms. DeTomaso was not scheduled to work, the Shift Managers, MITs and/or Cashiers did the identical work that Ms. DeTomaso had done.  Even when Ms. DeTomaso was working, the nature of her job was mostly indistinguishable from that of the hourly, non-exempt employees, except that she was required to work more than 40 hours per week and was not given overtime compensation.

## COLLECTIVE ACTION ALLEGATIONS

167.    Plaintiffs bring this action as a collective action to recover unpaid wages, including unpaid overtime compensation, pursuant to the Fair Labor Standards Act, 29 U.S.C.

§§ 207 and 216(b), on behalf of a class of current and former Store Managers employed by Defendant during the statutory period covered by this Complaint.

168.   Plaintiffs bring this suit on behalf of the following similarly situated persons:

All current and former Store Managers who have worked for Defendant within the statutory period covered by this Complaint, and elect to opt-in to this action pursuant to the FLSA, 29 U.S.C. § 216(b) ("Nationwide Collective Class").

169.   Plaintiffs allege on behalf of the Nationwide Collective Class that they are: (i) entitled to unpaid wages from Defendant for overtime work for which they did not receive overtime premium pay, as required by law; and (ii) entitled to liquidated damages pursuant to the FLSA, 29 U.S.C. § 201, *et seq.*

170.   The claims under the FLSA may be pursued by those who opt-in to this case pursuant to 29 U.S.C. § 216(b).

171.   Defendant has engaged in a continuing and willful violation of the FLSA.

172.   Plaintiffs are unaware of the names and the capacities of those defendants sued as DOES 1 through 10 but will seek leave to amend this Complaint once their identities become known to Plaintiffs.   Upon information and belief, Plaintiffs allege that at all relevant times each Defendant was the officer, director, employee, agent, representative, alter ego, or co-conspirator of each of the other defendants.   In engaging in the alleged conduct herein, defendants acted in the course, scope of, and in furtherance of the aforementioned relationship.   Accordingly, unless otherwise specified herein, Plaintiffs will refer to all defendants collectively as "Defendant" and each allegation pertains to each of the defendants.

173.   There are numerous similarly-situated current and former Store Managers of Aldi who have worked over 40 hours a week without appropriate overtime pay, in violation of the FLSA.   These Store Managers all had similar, if not identical, job responsibilities.   These Store

Managers all spent over 90% of their time performing non-managerial tasks and only superficially differed from hourly, non-exempt workers.

174.     These similarly-situated current and former Store Managers would benefit greatly from the issuance of a court-supervised notice of the present lawsuit and the opportunity to join in the lawsuit pursuant to 28 U.S.C. § 216(b).  These similarly-situated employees are known to Defendant, are readily identifiable, and can be located through Defendant's records.  As such, notice should be sent to past and present Store Managers of Aldi.

## CLASS ACTION ALLEGATIONS

175.     Plaintiffs further bring this action as a state-wide class action pursuant to Fed. R. Civ. P. 23, on behalf of themselves and a class of current and former Store Managers employed by Defendant within the State of New York to recover unpaid wages, including premium overtime compensation for all hours worked in excess of 40 per workweek, and "spread of hours" compensation for all hours worked in excess of 10 hours in a single workday, pursuant to the NYLL.

176.     Plaintiffs bring this suit on behalf of themselves and a class of similarly situated persons composed of:

> All current and former Store Managers who have worked for Defendant in the State of New York during the statutory period covered by this Complaint (the "NY Class").

177.     Plaintiffs allege on behalf of the NY Class that Defendant violated the NYLL by, *inter alia*: (i) failing to pay them overtime at the rate of one and one-half times the employee's regular salary for all hours worked in excess of 40 hours in any given workweek; and (ii) failing to pay spread of hours pay for all work in excess of 10 hours in a single workday.

178.     The claims brought pursuant to the NYLL may be pursued by all similarly-situated persons who do not opt out of the NY Class pursuant to Fed. R. Civ. P. 23.

179.    The members of each of the NY Class are so numerous that joinder of all members is impracticable.  While the exact number of the members of the NY Class is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe there are hundreds of individuals in the NY Class.

180.    Common questions of law and fact, the answers to which will advance this litigation, exist as to the NY Class and predominate over any questions only affecting them individually.  Indeed, there are few if any purely individual issues in this case.  The questions of law and fact that are common to Plaintiffs and all members of the NY Class include, but are not limited to, the following:

(a)    whether Store Managers are improperly classified as "exempt" employees under the NYLL;

(b)    whether  Plaintiffs and the members of NY Class were expected to and/or were mandated to regularly work hours without compensation in violation of the NYLL;

(c)    whether Defendant has failed to pay Plaintiffs and members of the NY Class all overtime compensation due to them for all hours worked in excess of 40 hours per week;

(d)    whether it was Aldi's policy or practice not to provide Plaintiffs and the NY Class spread-of-hours pay as required by the NYLL;

(e)    whether Plaintiffs and members of the NY Class are entitled to compensatory damages, and if so, the means of measuring such damages; and

(f)    whether Plaintiff and members of the NY Class are entitled to liquidated damages and injunctive relief.

181.    The claims of Plaintiffs are typical of the claims of the members of the NY Class they seek to represent.  Plaintiffs and the members of the NY Class work, or have worked, for Aldi as Store Managers and are, or were, subject to the same compensation policies and practices, including not being compensated for all hours worked and/or not being paid overtime compensation.

182.    Plaintiffs will fairly and adequately protect the interests of the NY Class as their interests are in alignment with those of the members of the NY Class.  They have no interests adverse to the class they seek to represent, and have retained competent and experienced counsel.

183.    Defendant has acted or has refused to act on grounds generally applicable to the NY Class, thereby making final injunctive relief or corresponding declaratory relief with respect to the NY Class as a whole appropriate.

184.    The class action mechanism is superior to other available methods for a fair and efficient adjudication of the controversy.  Common issues of law and fact predominate over any individual issues.  The damages suffered by individual members of the NY Class may be relatively small when compared to the expense and burden of litigation, making it virtually impossible for members of the NY Class to individually seek redress for the wrongs done to them.

185.    The Nationwide Collective Class and the NY Class are hereafter together referred to as the "Classes."

### FIRST CLAIM FOR RELIEF
### FAIR LABOR STANDARDS ACT OVERTIME VIOLATIONS
**(On Behalf of the Nationwide Collective Class)**

186.    Plaintiffs, on behalf of themselves and the Nationwide Collective Class, reallege and incorporate by reference the paragraphs above as if they were set forth again herein.

187.    At all relevant times, Aldi has had gross revenues in excess of $500,000.

188.    At all relevant times, Aldi has been and continues to be, an employer engaged in interstate commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

189.    At all relevant times, Defendant has employed, and/or continues to employ, Plaintiffs and each of the Nationwide Collective Class Members within the meaning of the FLSA.

190.    At all relevant times, Defendant had a willful policy and practice of misclassifying Plaintiffs and similarly situated Store Managers as "exempt" in order to avoid paying them for all hours worked or appropriate overtime compensation for all hours worked in excess of 40 hours per workweek.

191.    As a result of the Defendant's willful failure to compensate its employees, including Plaintiffs and the members of the Nationwide Collective Class, for all hours worked and at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek, Aldi has violated and, continues to violate, the FLSA, 29 U.S.C. §§ 201, *et seq.*

192.    The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

193.    Due to the Defendant's FLSA violations, Plaintiffs, on behalf of themselves and the members of the Nationwide Collective Class, are entitled to recover from the Defendant: compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

**SECOND CLAIM FOR RELIEF**
**NEW YORK LABOR LAW – OVERTIME VIOLATIONS**
**(On Behalf of the NY Class)**

194.    Plaintiffs, on behalf of themselves and all NY Class members, reallege and incorporate by reference the paragraphs above as if they were set forth again herein.

195.    Plaintiffs were employed by Aldi within the meaning of the NYLL.

196.    At all relevant times, Defendant had a willful policy and practice of misclassifying Plaintiffs and similarly situated Store Managers as "exempt" in order to avoid paying them for all hours worked or appropriate overtime compensation for all hours worked in excess of 40 hours per workweek.

197.    As a result of the Defendant's willful failure to compensate its employees, including Plaintiffs and the members of the NY Class, for all hours worked and at a rate not less than one and one-half times the regular rate of pay for work performed in excess of 40 hours in a workweek, Aldi has violated and, continues to violate, N.Y. Lab. Law Article 19 §§ 650, *et seq.*, and the supporting New York State Department of Labor Regulations.

198.    Due to the Defendant's violations of the NYLL, Plaintiffs and the members of the NY Class are entitled to recover from the Defendant: compensation for unpaid wages; an additional equal amount as liquidated damages; and reasonable attorneys' fees and costs and disbursements of this action, pursuant to N.Y. Lab. Law Article 19 § 663.

**THIRD CLAIM FOR RELIEF**
**NEW YORK LABOR LAW – SPREAD OF HOURS VIOLATIONS**
**(On Behalf of the NY Class)**

199.    Plaintiffs, on behalf of themselves and all members of the NY Class, reallege and incorporate by reference the paragraphs above as if they were set forth again herein.

200.    Plaintiffs and members of the NY Class worked more than 10 hours in a workday.

201.    Defendant has willfully failed to pay Plaintiffs and the members of the NY Class additional compensation of one hour's pay at the basic minimum hourly wage rate for each day during which they worked more than 10 hours.

202.    Defendant's failure to pay Plaintiffs and the members of the NY Class spread of hours compensation for each day they worked in excess of 10 hours is a willful violation of N.Y. Lab. Law Article 19 §§ 650, *et seq.*, and the supporting New York State Department of Labor Regulations.

203.    Due to Defendant's violation of the NYLL, Plaintiffs and the members of the NY Class are entitled to recover from Defendant: an award of damages for their unpaid compensation; liquidated damages; reasonable attorneys' fees and costs; and disbursements of the action, pursuant to the N. Y. Lab. Law Article 19 § 663.

### FOURTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT
**(On Behalf of NY Class)**

204.    Plaintiffs, on behalf of themselves and all NY Class members, reallege and incorporate by reference the paragraphs above as if they were set forth again herein.

205.    This Count is pled in the alternative to Plaintiffs' Second and Third Claims for Relief.

206.    Plaintiffs and the NY Class were not paid and continue not to be paid wages for all time that they worked.

207.    Defendant retained the benefit of the Plaintiffs' and the NY Class members' uncompensated work under circumstances which rendered it inequitable and unjust for Defendant to retain such benefits without paying for their value.

208.    Consequently, Defendant was unjustly enriched by requiring Plaintiffs and members of the NY Class to work for hours for which they were not compensated.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and/or on behalf of themselves and all other similarly situated members of the Nationwide Collective Class, and members of the NY Class, respectfully request that this Court grant the following relief:

A.    Designation of this action as a collective action on behalf of the Nationwide Collective Class, and prompt issuance of notice pursuant to 29 U.S.C. § 216(b), apprising them of the pendency of this action, and permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. § 216(b);

B.    Designation of the action as a class action under Fed. R. Civ. P. 23 on behalf of the NY Class;

C.    A declaratory judgment that the practices complained of herein are unlawful under the FLSA and NYLL;

D.    An injunction against the Defendant and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies and patterns set forth herein;

E.    An injunction against the Defendant and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from taking any retaliatory actions against Plaintiffs, the Nationwide Collective Class and the members of the NY Class;

F.    An award of unpaid overtime compensation to Plaintiffs, the Collective Action members, and the members of the NY Class;

G.    An award to Plaintiffs and the members of the NY Class of spread of hours pay under regulations promulgated under the NYLL;

H.    An award of liquidated damages to Plaintiffs and members of the Classes;

I.    An award of prejudgment and post-judgment interest to Plaintiff and members of the Classes;

J.    An award of costs and expenses of this action together with reasonable attorneys' and expert fees to Plaintiffs and members of the Classes; and

K.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.

Dated: March 29, 2016                                  Respectfully submitted,


By: s / Frank S. Gattuso              ___
**O'HARA, O'CONNELL & CIOTOLI**
Dennis O'Hara (Bar Roll No. 102293)
Frank Gattuso (Bar Roll No. 513636)
7207 E. Genesee Street
Fayetteville, NY 13066
Telephone: (315) 451-3810
Facsimile: (315) 451-5585

**FARUQI & FARUQI, LLP**
Adam Gonnelli (Bar Roll No. 515045)
Innessa S. Melamed
685 Third Ave., 26th Floor
New York, NY 10017
Telephone: (212) 983-9330
Facsimile: (212) 983-9331

*Attorneys for the Plaintiffs*